# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| PRESLEY NAVE, SR. & RUBY NAVE ) | |
| ) | |
|     Debtors & ) | |
|     Plaintiffs/Appellants ) | Case No. 3:05-0104 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| LIFE BANK, et. al. ) | |
| ) | |
| ) | |
|     Defendant/Appellee ) | |

## MEMORANDUM

On this appeal from a decision of the United States Bankruptcy Court for the Middle District of Tennessee ("Bankruptcy Court"), Appellants seek review of that court's Order (Docket No. 1, Certified R. on Appeal No. 2) granting Appellee's motions for summary judgment, and denying Appellants' corresponding motions, on Appellants' claims of agency, wrongful inducement of breach of contract, and wrongful inducement of breach of fiduciary duty. (Docket No. 6) Appellee has responded to Appellants' arguments (Docket No. 7) and Appellants have replied (Docket No. 8). For the reasons discussed herein, the Bankruptcy Court's Order will be affirmed in all respects relevant to this case.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Appellants Presley and Ruby Nave are elderly, deaf adults who are largely dependent on their son, Presley Nave, Jr., for communicating with others.[1] First Priority is a mortgage brokerage operated by James and Bonnie Brink that, in June 1998, obtained a loan for the Naves that was secured by the Naves' residence. In July 1999, Presley Nave, Jr. contacted First Priority about the possibility of refinancing his parents' June 1998 loan. First Priority subsequently proposed that the Naves refinance that loan and other smaller debts with a new loan, also secured by their residence.

First Priority suggested that the proceeds of this new loan be used to purchase a "HomeFree" annuity product, the monthly payments from which would equal the monthly payments on the proposed loan plus escrow payments. The Naves accepted this proposal and entered into a Broker Disclosure Agreement with First Priority. First Priority, pursuant to this agreement, undertook to obtain a $235,000 loan for the Naves. Under the terms of another one of its agreements, this time with mortgage lender Life Bank, First Priority sold, among its other products, loans offered by the Bank. First Priority ultimately submitted the Naves' application package to Life Bank for its approval.

The Naves' application contained an inflated estimate of their monthly income. The parties disagree about how such an estimate came to be part of the application package but, in any case, the inflation led the Naves to qualify for a loan of a far greater amount than the one for which they would have been eligible, had their true income been known. On September 9, 1999,

---

[1] All facts have been drawn from the Bankruptcy Court's Memorandum and Order on Cross Motions for Summary Judgment (Docket No. 1, Certified R. on Appeal No. 35), Appellants' Brief In Support of Appeal (Docket No. 6), and Appellee Life Bank's Brief (Docket No. 7).

Life Bank loaned the Naves $235,000.00. Pursuant to First Priority's advice, the Naves used $118,000 of the loan proceeds to purchase the HomeFree annuity product. At or near the time of the closing of the loan, Life Bank paid to First Priority, as compensation for its brokerage, a yield spread premium (YSP) of $10,281.25.

Through July 2000, the Naves received monthly payments on the annuity and used that money to make payments on their Life Bank loan. The Naves received no further annuity payments after July 2000, however, and they were thus unable to pay the installments on that loan as of August 1, 2000. In November 2000, the United States Attorney's Office contacted the Naves and advised them that their annuity had been sold to the United States Attorney, as it was part of a large-scale "Ponzi scheme." The Naves thereafter learned that the operation of the HomeFree program, including the issuance of annuities such as the one they had purchased, had been enjoined in 1999 by a United States District Court.

Threatened with foreclosure on their mortgage, the Naves filed for relief in bankruptcy on February 5, 2001 and commenced this adversary proceeding in the Bankruptcy Court on May 14, 2001. On June 18, 2001, Life Bank filed a motion to dismiss the Naves' claims against it, which the Bankruptcy Court granted on August 6, 2001. On April 17, 2002, this court reversed that decision and remanded the case to the Bankruptcy Court for further proceedings. In November 2003, the Naves and Life Bank filed motions for partial summary judgement and summary judgement, respectively. On January 26, 2004, the Bankruptcy Court denied the Naves' motions and granted in part the motions of Life Bank. Following that court's December 13, 2004 issuance of a Final Order of Judgement, the Naves filed the present appeal.

# ANALYSIS

## I.    Standard of Review

This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a) (2000).  In hearing an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's findings of fact for clear error and the court's conclusions of law *de novo*.  *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002); *see also Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998), *cert. denied*, 525 U.S. 978 (1998).

The Naves' appeal raises three questions for this court to review: (1) whether an agency relationship existed between Life Bank and First Priority and, if so, whether Life Bank should be bound by the Bankruptcy Court's judgment against First Priority;[2] (2) whether Life Bank wrongfully induced First Priority to breach the Broker Disclosure Agreement that First Priority made with the Naves; and (3) whether Tennessee recognizes the tort of wrongful inducement of breach of fiduciary duty and, if so, whether Life Bank wrongfully induced First Priority to breach its fiduciary duty to the Naves.

## II.    No Agency Relationship Existed Between First Priority and Life Bank

The Bankruptcy Court granted Life Bank's motion for summary judgment on the Naves' claim that Life Bank was liable for fraud based on Life Bank's agency relationship with First Priority.  (Docket No. 1, Certified R. on Appeal No. 35 at 11)  Accordingly, it denied the Naves' corresponding summary judgment motions.  (*Id.*)  In doing so, that court applied the agency

---

[2]The Bankruptcy Court, as part of its December 13, 2004 Order, granted the Naves a judgment against First Priority's James and Bonnie Brink for fraudulent misrepresentation. (Docket No. 1, Certified R. on Appeal No. 2)

4

factors delineated in *Youngblood v. Wall*, 815 S.W.2d 512 (Tenn. Ct. App. 1991), and *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654 (Tenn. 1982), and determined that "Life Bank is entitled to judgment as a matter of law that the Brinks and/or First Priority were not agents of Life Bank." (Docket No. 1, Certified R. on Appeal No. 35 at 11)

The Naves have correctly noted that *Youngblood* and *Masiers* are more appropriately used in disputes involving employer-employee relationships, as opposed to principal-agent ones. (*See* Docket No. 6 at 8); *Nat'l Life & Accident Co. v. Morrison*, 162 S.W.2d 501, 504 (Tenn. 1942) (recognizing the distinction between agents and servants); 27 Am. Jur. 2d *Employment Relationship* § 3 (2004) ("It has also been said that, while an employment relationship concerns the performance of manual or skilled labor for an employer, an agency relationship generally relates to business transactions, particularly commercial or contractual dealings between two principals through the medium of the agent.").

Even after applying precedent more aptly suited to principal-agent relationships, however, this court finds that the Bankruptcy Court correctly granted summary judgment on this claim. No reasonable jury could find that First Priority was an agent of Life Bank. *Cf. Yokley v. Liggett*, No. 01-A-0019203CV00110, 1992 WL 279845, at *5 (Tenn. Ct. App. Oct. 14, 1992) ("Although the words "agent" and "servant" are not wholly synonymous, there is no basic distinction between the liability of a principal for the tort of his agent and the liability of a master for the tort of his servant.").

In determining the existence of an agency relationship, a court should examine the conduct of, and relationship between, the involved parties. *Harben v. Hutton*, 739 S.W.2d 602, 606 (Tenn. Ct. App. 1987). An agency relationship does not require an explicit contract or agreement between the parties. *Id.*; *see also Warren v. Estate of Kirk*, 954 S.W.2d 722, 725

5

Case 3:05-cv-00104   Document 9   Filed 11/03/05   Page 5 of 15 PageID #: 5

(Tenn. 1997). Indeed, "if the facts establish the existence of an agency relationship, it will be found to exist whether the parties intended to create one or not." *Harben*, 739 S.W.2d at 606.

A key factor in an examination of agency is whether the principal exercised control over the agent. *White v. Revco Disc. Drug Ctrs.*, 33 S.W.3d 713, 723 (Tenn. 2000). It is the principal's actual exercise of this control, rather than its mere right to control, that is most important to this analysis. *Id.* Additional factors to consider in evaluating the existence of agency include the following: (1) the source of the alleged agent's compensation; (2) the party who first set the alleged agent in motion; and (3) the party whose interests the agent is working to advance. *Harben*, 739 S.W.2d at 607.

Tennessee courts have noted that, in evaluating whether one party exercised such control over the other that an agency relationship existed, a court must focus on the extent of control exercised over the alleged agent in the performance of its work. *Sodexho Mgmt., Inc. v. Johnson*, No. M2003-00660-COA-R3-CV, 2004 WL 2533821, at *3 (Tenn. Ct. App. Nov. 8, 2004); *Haskins v. Yates*, No. 88-99-II, 1988 WL 80967, at *5 (Tenn. Ct. App. Aug. 5, 1988). If the purported principal controls only the *result* of the work, the alleged agent is more aptly termed an independent contractor, but the same entity is an agent if "the employer's will is represented by the *means*, as well as the result." *Sodexho*, 2004 WL 2533821, at *3 (emphasis added).

In Tennessee, a principal controls the means of the work performed by an agent when, for example, the principal has the power to terminate the agent's contract if the agent conducts itself in a manner of which the principal does not approve. *See Franklin Distrib. Co. v. Crush Int'l*, 726 S.W.2d 926, 930 (Tenn. Ct. App. 1986) (finding such control where a principal had the power to terminate the existence of its agent's entire franchise if the agent performed in contravention of its agreement with the principal). A principal also controls such means when it

6

uses the agent as "merely . . . a conduit" through which to sell the principal's goods and dictates all manners of such sales. *See Haskins*, 1988 WL 80967, at *5. In contrast, the courts have found such control to be lacking when, for instance, a homeowner did not direct a real estate agent to pursue the sale of his home, but did agree to sell it for a certain price, *see Harben*, 739 S.W.2d at 603, and when employees were contractually entitled to receive insurance coverage through their employer, but had no power to direct the employer's actions in selecting such coverage, *see Nideffer v. Clinchfield R.R. Co.*, 600 S.W.2d 242, 246 (Tenn. Ct. App. 1980).

Notably, one party's requirement that another party achieve specific results or follow particular standards does not create a principal-agent relationship. *Sodexho*, 2004 WL 2533821, at *3 ("every contract for work to be done reserves to the principal . . . a certain degree of control because some degree of control is necessary to assure that the work is performed according [to] expectations or specifications"); *Greene v. Ellis* (*In re Ellis*), 152 B.R. 211, 218 (Bankr. E.D. Tenn. 1993) ("A requirement that work be performed according to standards and specifications imposed by an employer under a contract is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of an employer.").

In a case with facts that are similar, although not identical, to those of the case at hand, a court determined that Freddie Mac, a mortgage purchaser, did not have so much control over First Union Mortgage Corporation (FUMC), a corporation that sold mortgages, as was necessary to create an agency relationship when the former established conduct guidelines for the latter. *Greene*, 152 B.R. at 217. The *Greene* court found that such guidelines, which included specifications as to what types of loans FUMC could sell to Freddie Mac, were merely "tools" used by Freddie Mac to facilitate its purchase of the mortgages and did not transform FUMC from an independent contractor into an agent. *Id.* at 214, 217.

7

Comparable guidelines existed in the case at hand. In particular, Life Bank required First Priority to submit to it a variety of information about potential borrowers who met Life Bank's pre-qualifications, which Life Bank then used to determine whether it wanted to extend loans to the borrowers. (*See* Docket No. 7 at 6) Life Bank also directed First Priority to perform a number of other tasks associated with First Priority's brokering of Life Bank loans. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 5) For instance, First Priority was required to "perform other services as Life Bank may require to close loans" and to "comply with all applicable local, state and federal laws." (*Id.*)

These guidelines, while seemingly extensive, are not indicative of Life Bank's control over First Priority's means of doing business, but rather were mere tools used by Life Bank to facilitate its selection of qualified borrowers. *Cf. Greene*, 152 B.R. at 217. Unlike the instances in which Tennessee courts have found that a principal controlled its agent's means of conducting business, this case does not reveal that Life Bank dictated First Priority's method of brokering loans. *See, e.g., Haskins*, 1988 WL 80967, at *5; *Franklin Distrib. Co.*, 726 S.W.2d at 930. Although Life Bank did require First Priority to meet certain standards with respect to the loan applications the latter submitted, it did not dictate how First Priority solicited such applications, or even whether it solicited any at all. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 8; Docket No. 7 at 6) Indeed, First Priority was not a mere conduit through which Life Bank conducted its business, *cf. Haskins*, 1988 WL 80967, at *5, nor did Life Bank have the ability to terminate First Priority's existence if First Priority performed in contravention of their agreement, *cf. Franklin Distrib. Co.*, 726 S.W.2d at 930. Instead, First Priority served as "a loan originator for many different products from many different financial institutions," and ultimately remained free from Life Bank's control over its method of doing business. (Docket No. 1, Certified R. on

8

Appeal No. 35 at 8)

In addition to Life Bank's lack of control over First Priority's means of conducting business, additional factors indicative of agency also are not in evidence here. As noted above, a court evaluating the existence of agency should consider who first set the alleged agent in motion, whose interests the alleged agent was working to advance, and who is providing the alleged agent with compensation. *Harben*, 739 S.W.2d at 607. An application of the first two of these factors to the case at hand leads to the conclusion that no agency relationship existed, and the third factor does not necessitate a different outcome.

In analyzing who first set an alleged agent in motion, it is important to note that "[o]rdinarily, a broker is the agent of the first party to employ him." *Harben*, 739 S.W.2d at 607. Here, the Naves, seeking to refinance their mortgage, were the first to approach and employ First Priority for the purposes of the transaction in question. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 2) As determined by the Bankruptcy Court, "Life Bank did not control [First] Priority's origination of the loan. . . . [N]o contact was had until [First] Priority submitted the completed application to Life Bank." (*Id.* at 8) Accordingly, Life Bank cannot be said to have set First Priority in motion in such a way as to have created an agency relationship because the Naves, not Life Bank, were the first party to approach First Priority.

Tennessee courts tasked with determining whose interests a party was working to advance have found that one party was not working in the other's interests so as to create an agency relationship when, for instance, the alleged agent was instead working to advance the dissimilar interests of a third party. *See Harben*, 739 S.W.2d at 607 (finding that a salesperson was not an agent of a homeowner when the salesperson instead was acting on behalf of a client seeking to buy the homeowner's house). Similarly, two parties did not create an agency relationship when

9

the purpose of their business arrangement was to advance interests beyond those of the purported principal alone. *See Greene*, 152 B.R. at 217 (finding no agency relationship where the object of a mortgage seller and mortgage purchaser's commercial contract was to benefit both of them); *see also Foster Trailer Co. v. United Fid. & Guar. Co.*, 228 S.W.2d 107, 109 (Tenn.1950) ("An elementary and essential factor in the relation of [p]rincipal and [a]gent is that the object of the contract is for the benefit of the principal."); *Nideffer*, 600 S.W.2d at 245 (finding that an employer was not an agent of its employees for the purposes of maintaining a group healthcare policy when such maintenance benefitted both parties). The dispute at hand reveals that First Priority was not working for the good of Life Bank alone. Instead, under the terms of its commercial contract with the bank and its Broker Disclosure Agreement with the Naves, First Priority also was working to advance its own interests in obtaining compensation for its brokering, as well as the interests of the Naves in procuring a mortgage. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 2, 8) As such, this second factor, like the first, fails to point to the existence of an agency relationship.

In contrast, an application of the third *Harben* factor for determining agency, the source of the alleged agent's compensation, may tend to suggest an agency relationship. It appears that most of the compensation that First Priority received for brokering the Naves' loan came from Life Bank in the form of the YSP. (Docket No. 6 at 10; Docket No. 1, Certified R. on Appeal No. 31 ¶ 57) First Priority apparently also received, as compensation for this transaction, "a brokerage fee of $4700.00 and certain expense reimbursements." (Docket No. 1, Certified R. on Appeal No. 31 ¶ 57) The source of these additional payments, however, remains unclear.[3]

---

[3]The Appellant's Statement of Material Facts lists these additional payments and cites to the deposition of James Brink. (Docket No. 1, Certified R. on Appeal No. 24 ¶ 57) This

10

Accordingly, the court cannot determine whether such payments were made by Life Bank or by the Naves. Even if the payments were made by Life Bank, however, the fact that First Priority derived its compensation for the transaction from Life Bank does not necessitate a finding of agency. *See Harben*, 739 S.W.2d at 606 ("While [an agreement to pay compensation] is a circumstance that can aid in determining the identity of an agent's principal . . . it is not sufficient, by itself, to establish the existence of an agency relationship.") Thus, because Life Bank did not control First Priority's means of doing business, did not set First Priority in motion, and was not the only party to benefit from its contract with First Priority, the fact that it compensated First Priority for brokering the Naves' mortgage is not enough to demonstrate that Life Bank and First Priority were in an agency relationship.

In addition, if this court was to find that Life Bank's guidelines for First Priority's managing of transactions with potential borrowers, coupled with its payment of compensation for First Priority's successful brokering of loans, created an agency relationship between the two, the import of such a decision would be that all mortgage brokers who arrange mortgages for lenders under similar circumstances would be the agents of such lenders. *See Greene*, 152 B.R. at 218. Because many mortgage brokers, including First Priority, broker loans for more than one lender, this result would have far-reaching implications. These policy considerations only strengthen the determination that First Priority was not Life Bank's agent.

The Bankruptcy Court's grant of summary judgment for Life Bank on this claim, as well as its corresponding denial of summary judgment for the Naves, is thus affirmed.[4] Accordingly,

---

deposition, however, is not part of the Certified Record on Appeal.

[4] Because the court is upholding the Bankruptcy Court's determination that First Priority was not an agent of Life Bank, it need not reach the parties' arguments as to whether Life Bank should be bound by the lower court's entry of judgment against First Priority. (*See* Docket No. 6

11

because no agency relationship existed, the court also affirms the Bankruptcy Court's determination that Life Bank is not liable for First Priority's fraudulent misrepresentations to the Naves regarding the HomeFree mortgage product. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 11)

**III.    Life Bank Did Not Wrongfully Induce First Priority to Breach its Contract with the Naves**

The Bankruptcy Court denied the Naves' motion for summary judgment--and granted Life Bank's corresponding motion--on the claim that Life Bank wrongfully induced First Priority to breach the Broker Disclosure Agreement that First Priority made with the Naves when they applied for their loan. (*See* Docket No. 1, Certified R. on Appeal No. 35 at 14-15) The Naves, in their appeal, maintain that Life Bank's payment of a YSP caused First Priority to market to them a loan that "could not possibly have been repaid without foreclosure." (Docket No. 6 at 13)

In order to make a case for wrongful inducement of breach of contract in Tennessee, a claimant must demonstrate each of the following seven elements: (1) a legal contract existed; (2) the wrongdoer knew of this contract; (3) the wrongdoer intended to induce a breach of this contract; (4) the wrongdoer acted maliciously in inducing such a breach; (5) the contract was, in fact, breached; (6) the wrongdoer's act was the proximate cause of the breach; and (7) damages resulted from the breach. *Warde v. Kaiser*, 887 F.2d 97, 101 (6th Cir. 1989).

Without indicating its reasoning, the Bankruptcy Court determined that the Naves had failed to establish the third, fourth, and sixth of these factors and, thus, had not demonstrated any wrongful inducement on the part of Life Bank. (Docket No. 1, Certified R. on Appeal No. 35 at

---

at 18-20; Docket No. 7 at 17-20)

12

14-15) After applying the *Warde* factors to the facts of this case, this court finds that the Bankruptcy Court's decision on this claim must be upheld.

The lack of evidence as to the third factor, intent to induce a breach of contract, is particularly clear.  A claimant tasked with demonstrating a wrongdoer's intent to induce must prove that the wrongdoer either desired his act to cause a breach or was substantially certain that his actions would result in one.  *See Mix v. Miller*, 27 S.W.3d 508, 515 (Tenn Ct. App. 1999) (explaining that "intent" denotes that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it"); *see also JIT Concepts, Inc. v. Shelby County Healthcare Corp.*, 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005) (applying this definition of "intent" to a case involving the inducement of a breach of contract).

The Naves here make a concerted effort to demonstrate that Life Bank was willfully blind to their low income and, accordingly, to their inability to repay the loan for which they had applied through First Priority.  (*See* Docket No. 1, Certified R. on Appeal No. 35 at 13)  Such willful blindness, they argue, amounts to constructive knowledge that First Priority was violating their fiduciary duty to the Naves by offering them a loan that they would not be able to repay. (*Id.* at 16)  Accordingly, the Naves claim, Life Bank knew or should have known that First Priority's primary motivation for offering them this too-large loan was to obtain the fees, including the YSP, that Life Bank would owe them for brokering such a transaction.  (*Id.*)

Not only have the Naves failed to offer anything more than speculation to support their assertions that Life Bank had constructive knowledge of their low income (*see* Docket No. 6 at 5), they have not demonstrated that such knowledge, if it did exist, led to the awareness that First Priority planned to breach its fiduciary duty to them or to an understanding that First Priority's motivation for taking such an action was to obtain the monetary compensation associated with the

13

brokering of a large loan.  Moreover, the Naves have failed to prove that Life Bank offered the YSP to First Priority for the purposes of causing First Priority to breach its contract with the Naves or with the substantially certain knowledge that such a breach would result.  Accordingly, the Naves have not maintained their burden of proof as to the intent element of their claim for wrongful inducement of breach of contract.  Because this is a necessary component of any showing of such inducement, the Naves' claim must fail, and the Bankruptcy Court's grant of summary judgment to Life Bank must be affirmed.  *See JIT Concepts, Inc.*, 358 F. Supp. 2d at 686.

### IV. The Court Declines to Create an Independent Tort for Wrongful Inducement of Breach of Fiduciary Duty

In appealing the Bankruptcy Court's judgment as a matter of law on their claim that Life Bank wrongfully induced First Priority to breach its fiduciary duty to them, the Naves concede that Tennessee has not recognized inducement of breach of fiduciary duty as an independent tort. (Docket No. 6 at 17 ("Tennessee apparently has not yet recognized inducement of breach of fiduciary duty as a distinct tort . . . ."))  The Naves argue, however, that "[t]he Tennessee Supreme Court would almost certainly recognize such a tort" and that, therefore, this court should acknowledge its existence and apply it to the case at hand.  Other than their assertion that, because inducing a breach of contract is tortious under Tennessee common law, "there is no reason why inducing a breach of fiduciary duty should not also be," the Naves provide the court with no evidence that Tennessee courts would be inclined to recognize this new tort.  (Docket No. 6 at 18)

When, as here, the Tennessee Supreme Court has not spoken on an issue, a federal court's

14

task is to determine how the state supreme court would respond if confronted with the matter. *Mills v. GAF Corp.*, 20 F.3d 678, 681 (6th Cir. 1994). Because the Naves have not highlighted–and the court, despite its search, has not independently discovered–any indication that Tennessee courts are willing to create a new tort targeted at the inducement of a breach of fiduciary duty, it cannot be predicted that the courts would do so if faced with the issue. Accordingly, the court declines to recognize such an action and affirms the Bankruptcy Court's denial of the Naves' motion for summary judgment on this claim, as well as its grant of Life Bank's corresponding motion. *Accord Valley Products Co. v. Landmark*, 877 F. Supp. 1087, 1095 (W.D. Tenn. 1994) (declining to create a tort that had not yet been recognized by Tennessee state courts).

## **CONCLUSION**

For the reasons stated herein, the Bankruptcy Court's Order of December 13, 2004 will be affirmed in all respects relevant to this case.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

15